MICHAEL STADTLER and Others v. SCHOOL DISTRICT NO. 40 IN THE COUNTY OF HOUSTON and Others.[1]

January 26, 1898.

Nos. 10,730—(37).

**School House—Change of Site—G. S. 1894, § 3677, subd. 4.**

The site of a school house already built in a common-school district of irregular shape, but composed of 95 40-acre tracts of land, according to government survey, was within less than three rods east of a line which, if drawn north and south through the district, would have divided equally the number of acres in said district, and was also within less than sixty rods south of a line which, if drawn east and west through said district, would have divided equally the number of acres therein. *Held*, that the school-house site was less than a quarter of a mile from the center of the district, for any question of a change of site arising under the provisions of G. S. 1894, § 3677, subd. 4.

**Citizenship—Children Born within the United States of Foreign Parents—Const. Amend. 14, § 1.**

Children born within the United States of foreign parents residing

[1] Reported in 73 N. W. 956.

therein, and not engaged in any diplomatic or official capacity under a foreign ruler, such children continuing to reside in this country, are citizens of the United States and of the state in which they reside, within the provisions of the first section of the fourteenth amendment to the federal constitution.

Appeal by plaintiffs from a judgment of the district court for Houston county dismissing the action on the merits, entered pursuant to the findings and order of Whytock, J. Reversed.

*James O'Brien,* for appellants.

*E. H. Smalley,* for respondents.

COLLINS, J.

This litigation arises under G. S. 1894. § 3677, subd. 4, which provides for changing a school-house site in a common-school district after it has once been designated. The cause was here before on an appeal from a judgment entered upon an order dissolving and setting aside a temporary injunction, and dismissing the action really upon the ground that the complaint failed to state a cause of action. 61 Minn. 259, 63 N. W. 638. The statute was there construed, the judgment reversed, and the case remanded for further proceedings.

An answer was then interposed by defendant trustees, and soon after, by reason of an election of officers, the views of the trustees of the defendant district were altered so that a majority were opposed to the change, whereupon eight of the taxpayers and residents of the district favorable to the change applied for, and were permitted to file, a complaint in intervention, which, for convenience, we will hereafter call the intervenors' answer. Both of these answers, the one made by the defendants and that filed by the intervenors, were prepared and signed by the same attorney.

The complaint alleged, among other things, that each of the five plaintiffs were, and for more than one year had been, taxpayers, legal voters and residents of the defendant district. It also alleged that the old site was within one-fourth of a mile of the center of the district,—a diagram showing the territory, its boundary lines, and the old and new sites, being attached thereto. It also alleged that at the time of the annual school meeting in July, 1894, at which

time the question of changing the site was voted upon, there were 77 legal voters, resident of and in said district for more than six months, each being numbered and named; and that there were but 46 legal voters present at such meeting, of whom 31 voted in favor of the proposed change, and 15 against it; and, further, that the new site was more than a half mile from the center of said district. It contained other allegations of no particular consequence in the present discussion.

Both answers expressly admitted that each of the five plaintiffs were taxpayers, legal voters and residents, as alleged. Both took issue upon the allegations that the old site was within a fourth of a mile of, and that the new one was more than a half mile from, the center of the district. Both answers denied that there were 77 legal voters, residents for at least six months, within the district, but admitted that there were 60 duly-qualified voters. The defendants' answer specially denied that certain persons named in the complaint, and numbered 4, 5, 15, 24, 28, 47, and 71,—seven in all,— were legal voters. And it expressly admitted that certain persons named in the complaint, and numbered 6, 7, 12, 13, 14, from 16 to 23, both inclusive, from 25 to 47, both inclusive (except the person numbered 28), from 48 to 65, both inclusive, and also those numbered 68, 69, 72, 73, 75, and 76, were duly qualified, and entitled to vote at the election upon the question at issue. As to the rest of the 77, the denial was on information and belief. It was thus admitted that of the 77 persons named and numbered in the complaint 59 were voters.

The intervenors' answer specially denied that those persons named in the complaint and numbered 3, 4, 5, 7, from 9 to 11, both inclusive, 14, 24, 28, 46, 47, 67, from 69 to 73, both inclusive, 75 and 76, were qualified to vote. It also denied, in the same connection, that one of the plaintiffs,—numbered 1 in the complaint,—was a qualified voter; and, upon information and belief, the same denial was made as to another of the plaintiffs,—numbered 12,—although, as before stated, both of these persons had been admitted to be legal voters elsewhere in this pleading. Fairly construed, the intervenors' answer admitted the qualifications of the remaining persons named in the complaint. As the denial went to 22 of the 77,

it particularly stood admitted that there were 55 legal voters in the district, and in this number the two plaintiffs before mentioned as named among the 22 disqualified were not included.

With these admissions, and upon the pleadings before mentioned, and a reply, the parties proceeded to trial before the court without a jury. The principal issues were: First, as to whether the old site was within one-fourth of a mile of the center of the school district; and, second, how many legal voters there were in the district, at the time of the annual election, who had resided therein for a period of at least six months? If the old site was within one-fourth of a mile of the center, and there were 61 legal voters in the district, with a residence for at least six months prior to the day of the meeting, the proposition to change the schoolhouse site was not lawfully carried, and the subsequent proceedings in pursuance of such vote were without authority of law.

Taking up these questions in order, it may be stated that this district was quite of irregular shape, as will be discovered when we say that it comprised all of section 6, township 101, range 5; the N. $\frac{1}{2}$ of section 1 and the N. E. $\frac{1}{4}$ and the S. $\frac{1}{2}$ of the N. W. $\frac{1}{4}$ of section 2, township 101, range 6; all of section 31, township 102, range 5; the S. $\frac{1}{4}$ and the S. $\frac{1}{2}$ of the N. $\frac{1}{2}$ of section 25, the S. $\frac{1}{2}$ of the N. E. $\frac{1}{4}$, the S. E. $\frac{1}{4}$, the E. $\frac{1}{2}$ of the S. W. $\frac{1}{4}$, and the S. E. $\frac{1}{4}$ of the N. W. $\frac{1}{4}$ of section 26, the E. $\frac{1}{2}$ and the E. $\frac{1}{2}$ of the W. $\frac{1}{2}$ of section 35, and all of section 36, township 102, range 6,—95 40-acre tracts, lying in four different townships. A road ran east and west through the center of the S. $\frac{1}{2}$ of section 31, township 102, range 5, and the center of the S. $\frac{1}{2}$ of section 36, township 102, range 6; and the old site was just south of this road, in the N. E. corner of the S. W. $\frac{1}{4}$ of the S. E. $\frac{1}{4}$ of section 36. The new site was on the E. line of the S. E. $\frac{1}{4}$ of section 35.

The precise center of this irregularly-shaped district might be determined with mathematical exactness, but it is unnecessary, for it would certainly be within a quarter of a mile of the old site. We prefer to take a practical way for ascertaining whether, under the provisions of section 3677, it was necessary, in order to effect a change of site, to have a majority of the legal voters who had resided in the district for a period of at least six months when the

vote was had, or merely necessary to have a majority of the legal voters who voted on the question. A line drawn north and south through the center of sections 1, 36, and 25 would run on the west line of the old site, and upon the east of said line we would have 50 40-acre tracts, or 2,000 acres of land, while on the west there would be 45 40-acre tracts, or 1,800 acres. A north and south line so drawn as to exactly equalize the number of acres, having 1,900 on each side, would be within three rods of the east line of the old site. A line drawn east and west through the center of the south half of sections 31, 36 and 35 would run along the north line of the old site, and on the north of this line we would have 54 40-acre tracts, or 2,160 acres, while on the south we would find 41 of these tracts, or 1,640 acres of land. Drawing this line further to the north, so as to have exactly 1,900 acres upon each side of it, we find such line within 60 rods—less than one-fourth of a mile—of the old site.

Tested by the strict rule of mathematics, or by the very practical rule just now applied, the old site was within one-fourth of a mile of the center of this district. The finding that plaintiffs had failed to establish the center of the district, or that the old site was within a quarter of a mile thereof, is not supported by the evidence.

The next question is as to the number of legal voters in the district who had been residents for at least six months prior to the day on which the annual meeting was held in 1894, and at which 31 votes were cast in favor of the change. As before stated, defendants and intervenors both admitted in their pleadings that there were 60 such voters, and also expressly admitted that each of the five plaintiffs was duly qualified, while defendants further named and admitted 59 out of the 77 named and numbered in the complaint as duly qualified voters in the district when the vote was had. And the intervenors named and admitted in like manner and as duly qualified voters 55 out of the 77 persons named and numbered by plaintiffs, and in this number two of the plaintiffs, who were legal voters, according to a prior admission in the answer, were not included.

It should be stated at this point that some six weeks after the cause had been tried and submitted upon the theory, evidently,

that the issues as to the number of legal voters in the district were settled and well understood, the trial court granted a motion, made by counsel for defendants and intervenors, to strike out from both answers the admissions that in said district there were at least 60 qualified voters. This action of the court is assigned as error by plaintiffs' counsel, but we shall have no occasion to pass upon it, for, as we regard the evidence as to the qualification of certain persons, residents of the district, but not admitted by defendants and intervenors to be voters therein, it becomes unnecessary.

For the purpose of determining the number of duly qualified voters, we disregard and put aside the admissions in both answers that the number was 60, and also the admission in defendants' answer that, of the persons named and mentioned in the complaint, 59 (naming them) were duly qualified, and take the admission in the intervenors' answer that of the 77 specified by plaintiffs 55 were voters, their names being stated. To this number we are justified in adding two of the plaintiffs,—Peter Carroll, numbered 1, and Peter Ernster, numbered 12, in the complaint,—for the express admission in the pleading that both were legal voters on the question at issue must control as against the denial elsewhere found in the same pleadings. These pleas or allegations,—one a denial, the other an admission, of the same matter,—were inconsistent, for both could not be true. The effect was to admit that both of the persons named were legally qualified voters at the annual meeting. This has been the ruling on the subject in this court since 1861. Derby v. Gallup, 5 Minn. 85 (119). The result is that 57 of the persons alleged by name in the complaint to have been voters on the question of a change of school-house site were admitted so to be by the intervenors' answer.

This brings us to a consideration of the evidence relative to the residence and legal qualification of a number of persons named in the complaint among the 77 voters in the district, but whose right to vote was put in issue by the intervenors' answer; their names appearing among the 22 before mentioned. It was conclusively shown that of these the persons numbered 3, 5, 9, 14, 28, 46, 70, 72, 73, and 76,—ten in all,—were born in the United States, and that each had reached the age of 21 years prior to the time of the meeting.

As to some of these persons, there might be a question as to whether their residence had been in the district for the requisite six months, but, as to those numbered 9, 46, 72, 73, and 76,—five in all,—the evidence was conclusive on this point, and that each had been a resident for more than six months immediately preceding the meeting. And the only question as to their qualification as voters arises out of the fact that in each instance their parents were aliens. Each of these persons had been born in the United States, had always resided therein, but each was a child of foreign-born parents, none of whom had become naturalized.

Counsel for respondents takes the somewhat surprising position that none of these persons were citizens of the United States because of foreign parentage, and it seems from the findings that the court so held. It is to be borne in mind that, as presented here, this is not a question of international, but of local or domestic, law, so that opinions of the courts or of department officials involving international questions respecting citizenship by birth are not in point. If citizens of the United States, these persons were legally qualified voters in the district under the provisions of sections 1 and 8, art. 7, of the constitution, and by virtue of their residence in this district for at least six months. The first section of the fourteenth amendment of the federal constitution declares that "all persons born  *  *  *  in the United States and subject to the jurisdiction thereof are citizens of the United States and of the state wherein they reside." It would seem that this language applied to the cases in controversy, for it stands uncontradicted that these persons were born in the United States, and had continuously resided therein thereafter. It does apply and control in each instance. As was said in a leading case:

"Any doubt on the subject, if there can be any, must arise out of the words, 'subject to the jurisdiction thereof.' They alone are subject to the jurisdiction of the United States who are within their dominions, and under the protection of their laws, and with the consequent obligation to obey them when obedience can be rendered; and only those thus subject by their birth or naturalization are within the terms of the amendment. The jurisdiction over these latter must, at the time, be both actual and exclusive. The words mentioned except from citizenship children born in

the United States of persons engaged in the diplomatic service of foreign governments, such as ministers and ambassadors, whose residence, by a fiction of public law, is regarded as part of their own country. This ex-territoriality of their residence secures to their children born here all the rights and privileges which would inure to them had they been born in the country of their parents. Persons born on a public vessel of a foreign country, while within the waters of the United States, and consequently within their territorial jurisdiction, are also excepted. They are considered as born in the country to which the vessel belongs. In the sense of public law, they are not born within the jurisdiction of the United States.

The language used has also a more extended purpose. It was designed to except from citizenship persons who, though born or naturalized in the United States, have renounced their allegiance to our government, and thus dissolved their political connection with the country. The United States recognize the right of every one to expatriate himself, and choose another country. * * * With this explanation of the meaning of the words in the fourteenth amendment, 'subject to the jurisdiction thereof,' it is evident that they do not exclude the petitioner from being a citizen. He is not within any of the classes of persons excepted from citizenship, and the jurisdiction of the United States over him at the time of his birth was exclusive of that of any other country." In re Look Tin Sing, 21 Fed. 905, opinion by Justice Field. See, also, Elk v. Wilkins, 112 U. S. 94, 5 Sup. Ct. 41.

In fact, it seems to have been the general rule before the adoption of the fourteenth amendment that a person born in this country, though of alien parents who had never been naturalized, is deemed to be a citizen under the laws of the United States. Lynch v. Clarke, 1 Sandf. Ch. 583, 639.

Taking the 55 persons named in the complaint as duly-qualified voters in the district, and admitted so to be by both answers, and the two plaintiffs, before referred to, and the five persons born in the United States of alien parents, we have a total of 62. To this number should be added Carl O. Swenson, who was not mentioned in any of the pleadings, but who was shown upon the trial to be a duly-qualified voter of the district, making a total of 63. From the admissions and the evidence it was conclusively established that upon the day of the annual election there were at least 63 legal voters in the district who had resided therein for the six months immediately preceding. The finding that 31 was a majority of all

the duly-qualified voters in the district at the time of the meeting was not supported by the evidence.

There is absolutely nothing in the contention of counsel that the plaintiffs ought not to prevail because of their laches in bringing this action. As the findings of the court upon the pivotal questions of fact were not supported by the evidence, a new trial must be had.

Judgment reversed.